**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**


HAKEEM PELUMI,
          Plaintiff,


          v.                                        C.A. No. 11-169-ML


GATEWAY HEALTHCARE;
ROBERT GENTILE, in his official capacity
as the Human Resources Manager for
Gateway Healthcare; MICHAEL BRAET, in his
official capacity as the Human Resources
Officer for Gateway Healthcare,
          Defendants.


**MEMORANDUM AND ORDER**

        The plaintiff in this employment discrimination action, Hakeem

Pelumi ("Pelumi"), acting *pro se*,  was employed by the defendant

Gateway  Healthcare  ("Gateway")  from  June  20,  2003  until  his

employment was terminated on May 21, 2009. Pelumi, who is African-

American, has filed a claim of wrongful termination on the basis of

race,  as  well  as  claims  of  libel,  libel  *per se*,  false  light,  and

disclosure of private facts about him. The matter before the Court

is Gateway's motion for summary judgment on all counts of Pelumi's

amended  complaint  (the  "Complaint")  and  Pelumi's  corresponding

cross-motion. For the reasons stated herein, Gateway's motion for

summary judgment is GRANTED and Pelumi's cross-motion is DENIED.


1

## I. Factual Background[1]

Gateway is a non-profit behavioral health care organization with more than 42 locations in Rhode Island and approximately 800 employees who provide services to individuals who may not otherwise have access to services they need. SUF ¶¶ 1-4. Tri-Hab, a Gateway affiliated program located in Woonsocket, offers a number of residential and therapeutic programs to address clients' substance abuse problems and co-occurring mental health disorders. SUF ¶ 5.

On June 20, 2003, Pelumi began working as a residential assistant at Men's House, a residential treatment center operated by Tri-Hab. SUF ¶ 18. Pelumi's responsibilities included supervising the residents, ensuring their safety, bringing them to twelve-step meetings and assisting them in crisis. SUF ¶ 19. Pelumi received a copy of the Tri-Hab professional code of ethics[2] and confirmed his understanding that any violation of that code could result in suspension or termination. Exhibit D (Docket # 70-4). Pelumi also confirmed receipt of Gateway's code of ethical conduct. Exhibit G (Docket # 70-7) with a signature date of February 9,

---

[1] The factual summary is based primarily on Gateway's statement of undisputed facts ("SUF") (Docket # 70) - submitted together with 17 supporting exhibits - which remain, for the most part, undisputed by Pelumi's submissions. Any disagreement with Gateway's factual representation Pelumi has stated in his objection (Docket # 73, Pages 2-3 of 3) or his statement of disputed facts ("SDF")(Docket # 75) are particularly noted.

[2] The copy signed by Pelumi appears to be designed for a chemical dependency counselor.

2006.

On November 14, 2003, Pelumi received a written warning from Beverly Nixon ("Nixon"), his supervisor, after Pelumi and a resident were seen speaking with two women at night, which was in violation of the rule that only staff or residents were allowed on the property outside of visiting hours. In addition, a scheduled fire watch had not been performed because Pelumi was playing dominoes with a resident. The warning advised Pelumi to develop strong boundaries with the residents and noted that the warning was not to be shared with residents. Exhibit H (Docket # 70-8).

On July 7, 2005, Pelumi received another written warning from Nixon related to a medication error, in which a resident took multiple doses of a controlled substance. By affixing his signature to the letter, Pelumi acknowledged the seriousness of the matter. Exhibit I (Docket (70-9).[3]

On August 31, 2005, Pelumi received a memo from David Spencer ("Spencer") regarding a telephone inquiry that had been made to Pelumi about a resident. Pelumi - who has some hearing difficulties for which he wears a hearing aid - asked another resident to retrieve the information. Spencer advised Pelumi that his action was "unacceptable and may potentially compromise the

---

[3]

Although Pelumi now asserts that another, white, employee was responsible for the mix-up, he apparently did not contest the allegation against him at the time.

3

confidentiality and safety of the residents." Exhibit K (Docket #
70-11). Pelumi was also reminded to carry spare batteries for his
hearing aid and he was asked to schedule a hearing assessment. Id.
A second memo related to Pelumi's hearing difficulties was sent to
Pelumi by Nixon on November 8, 2005. On that occasion, Pelumi had
put a client on the phone to help "interpret" a call from the
director of substance abuse services. Exhibit L (Docket # 70-12).
Pelumi was advised to use the provided TTY machine to ensure clear
communication. Id.

As related in an incident report written by Nixon, on July 31,
2006, Pelumi made several calls to her at night to report problems
with some of the residents. According to Nixon, when she
investigated the incident, some of the residents reported being
locked out during a fire drill conducted by Pelumi and other
residents stated that they were told by Pelumi to leave the
property. Exhibit M (Docket # 70-13).

A further written warning to Pelumi was issued by Nixon on
August 7, 2006. The warning stated that several residents had
complained that Pelumi treated them disrespectfully and it reminded
Pelumi that several conversations concerning these issues had taken
place over time.  Nixon set forth a list of instructions for
Pelumi, which Pelumi acknowledged by signing the warning. Exhibt N
(Docket # 70-14).

On January 9, 2009, Pelumi received another written warning

4

from Nixon, admonishing him for disposing of beer cans on the property. Exhibit O (Docket #70-15).

The events leading to the eventual termination of Pelumi's employment began on May 11, 2009, when a female client ("CM") from a Gateway residential substance abuse program faxed a client grievance form (the "Grievance") to Gateway's Behavioral Human Rights Officers ("HROs") who are charged with reviewing and investigating client complaints. SUF ¶ 30. Affidavit of HRO Michael Braet ("Braet") ¶ 11, Tab 2 (Docket # 70-2, Page 11 of 15). The Grievance states that Pelumi sent a male resident ("NF") to CM to tell her that she was beautiful and that Pelumi wanted to be with her. CM further alleges that Pelumi walked over to her at the end of a meeting, grabbed her arm and pulled her over to talk,[4] and that Pelumi gave NF his phone number to give to CM and told NF to tell CM that "it didn't matter if [she] was a lesbian, he could change [her]." SUV ¶ 32, Braet Affidavit ¶ 12, Tab 2.  With respect to these allegations, Pelumi only disputes that he had another client approach CM to tell her "she was beautiful and [he] wanted to be with her." Pelumi Declaration ¶ 3 (c) (Docket # 73 Page 2 of 3).

On May 13, 2009, Braet met with NF, who corroborated CM's

_____

[4]

Pelumi does not dispute Gateway's contention that, on that evening and at an Alcoholics Anonymous meeting, CM walked away from Pelumi screaming.  SUF ¶ 40.

account. SUF ¶ 33.  According to Gateway, it then "interviewed all of the individuals who it knew were involved in the incident."  SUF ¶ 34. Pelumi disputes that representation, pointing out that 15 male residents attended the meeting in question, but that Gateway only interviewed "the complaining client and her accomplice." Pelumi Declaration 3 (b) (Docket # 73).

Pelumi, who had been suspended pending an investigation into the matter, met with Braet and Gateway Human Resources Manager Bob Gentile ("Gentile") on May 14, 2009. SUF ¶ 35. According to Braet, he reviewed the allegations against Pelumi without using client names; Pelumi, however, immediately knew to whom Braet was referring. SUF ¶ 38. Pelumi admitted that he told NF that he liked CM and wanted to be with her, but could not do so because she was a client. SUF ¶ 39. Pelumi also admitted telling NF that he had "changed the lives of lesbians he has known."  Braet Affidavit ¶ 20 (Docket # 70-2). Although Pelumi denied touching CM, he admitted to giving his private cell phone number to NF and other clients. SUF ¶ 41. When asked whether he had anything to add during the meeting with Braet and Gentile, Pelumi stated that Gateway's clients "cannot be trusted" and that "they are all liars." SUF ¶ 44.

Based on his assessment that Pelumi had negative opinions of the clients with whom he worked and that Pelumi's continued employment posed a serious risk to Gateway clients, Braet recommended that Pelumi's employment be terminated. SUF ¶ 49, Braet

Affidavit ¶ 23.

Gateway's V.P. of Human Resources, Maura Goodwin ("Goodwin"), its Director of Adult Residential Services, David Testoni ("Testoni"), and its Senior V.P. of Adult Services, James DiNunzio ("DiNunzio"), after speaking with Braet and Gentile and reviewing Braet's HRO report, collaboratively decided to terminate Pelumi's employment. Goodwin, Testoni and DiNunzio "had not met [Pelumi] in person and did not know or consider his race." SUF ¶ 51. With respect to that particular contention, Pelumi suggests that "[h]e couldn't just remember, but may have met in the past, both Gentile and Braet;" he does not contend, however, that he ever met Goodwin, Testoni, and/or DiNunzio. Pelumi Declaration ¶ 3(d).

On May 20, 2009, Gentile attempted to meet with Pelumi to inform him of the termination, but Pelumi did not attend the meeting. SUF ¶ 53. In a letter dated May 20, 2009, Gentile informed Pelumi that the purpose of the meeting was to discuss the results of the Client Rights Complaint Report and that Pelumi's employment had been terminated for violation of Gateway's policy against sexual harassment and for gross professional misconduct. Exhibit R (Docket # 70-18).

Pelumi met with Gentile and Nixon on May 21, 2009. SUF ¶ 54. Although Pelumi asserts that the meeting "was 'staged' as Ms. Nixon was coerced into attending," Pelumi Declaration ¶ 3(e)(Docket # 73), his assertion is not supported by the facts. On her part,

7

Nixon states in her affidavit that Gentile asked her to attend the May 21, 2009 meeting and that she completed and signed off on a Plan of Action ("POA") without being coerced to do so. Nixon Affidavit ¶¶ 8, 9.  The POA recommends "Termination for gross professional misconduct and sexual harassment of clients" and describes Pelumi's conduct as "inappropriate touching of client, made inappropriate and unprofessional remarks of a sexual nature to client and offered personal phone number to client." Exhibit S (Docket # 70-19). In a May 22, 2009 e-mail to Pelumi, Nixon stated that she had to be in the termination meeting because she was his supervisor and that she "had no part in the decision process and had nothing to do with the investigation." Exhibit T (Docket # 70-20.

In February 2010[5], Pelumi filed a charge of discrimination (the "Charge") with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC"). Exhibit U (Docket # 70-21). In the Charge, Pelumi alleges that he has been a victim of unlawful employment discrimination because of his race and color "in that Respondent did not conduct an extensive investigation into the allegations of the client and terminated [his] employment." Id.

---

[5]

The Charge is dated by Pelumi as 2/4/09 and bears a stamped date of FEB 26 2010 from RICHR and a stamped date of FEB 04 2009 from the EEOC Boston Area Office. Given that Pelumi refers to his May 2009 termination, the 2009 dates would appear to be in error.

By letter dated January 26, 2011, the EEOC informed Pelumi that it was unable to conclude that a violation of Title VII had occurred and it advised him of his right to file suit against Gateway within 90 days of receipt of the notice. Pelumi Exhibit 7. (Docket # 25-1, Pages 10-13 of 13). RICHR informed Pelumi on March 28, 2011 that it concurred with the EEOC ruling of no probable cause in Pelumi's discrimination charge. Pelumi Exhibit 6 (Docket # 52-1, Page 9 of 15).

On April 20, 2011, Pelumi filed a complaint in this Court against Gentile and Braet, both individually and in their official capacity as HROs of Gateway. (Docket # 1). Pelumi alleged that his employment was terminated "due to his race as a black African American." Complaint ¶ 15. In addition to his wrongful termination claim (Count VII), Pelumi also raised claims of intentional infliction of emotion distress (Count I), libel and libel *per se* (Counts II, III), false light (Count IV), and [disclosure of] private facts (Count V). Pelumi sought compensatory damages, back pay, front pay and attorney's fees, as well as punitive damages (Count VI).

On October 17, 2011, this Court adopted Magistrate Judge Almond's report and recommendation ("R&R")(Docket # 18) that a motion to dismiss by the individual defendants be granted in part, and that the case against Gentile and Braet individually be dismissed. Memorandum and Order (Docket # 21). The case was allowed

9

to proceed under Title VII and, with respect to Pelumi's state claims, pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). Pelumi was also ordered to file an amended complaint consistent with the R&R.

On October 17, 2011, Pelumi filed an amended complaint (Docket # 22), in which he added Gateway as a defendant and reasserted his claims against Gentile and Braet in their official capacity. The defendants again sought dismissal of the complaint. On January 26, 2012, this Court adopted Magistrate Judge Almond's R&R in which he recommended that Pelumi's claim of infliction of emotional distress be dismissed because Pelumi's exclusive remedy for work-related injuries was covered by the Workers' Compensation Act, R.I. Gen. Laws § 28-29-20. (Docket # 31).  The Court also agreed with the Magistrate Judge's conclusion that, under the Rule 12(b)(6) standard, Pelumi had sufficiently pled a Title VII claim against Gateway by asserting that he was "terminated because of his race" and by stating that Gateway "overlooked" a white co-worker's violation of its policies. R&R (Docket # 30).

Following the partial denial of Gateway's motion to dismiss the amended complaint, the parties engaged in discovery. On January 30, 2013, Gateway filed a motion for summary judgment (Docket ## 69, 70). Pelumi followed suit with a cross-motion for summary judgment on February 11, 2013, (Docket ## 71-73), to which Gateway responded on February 19, 2013. (Docket # 76). Pelumi filed a reply

on March 4, 2013. (Docket # 77).

## II. Standard of Review

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Prescott v. Higgins, 538 F.3d 32, 40 (1st. Cir.2008) (citations omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Id. (quoting Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir.2008)).

In making a determination whether the moving party is entitled to summary judgment, the Court "read[s] the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d. 5, 7 (1st Cir. 1998) (citing Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.1997)). However, the Court ignores any "conclusory allegations, improbable inferences, and unsupported speculation." Mendez–Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir.2011) (citations omitted). In employment discrimination cases, the summary judgment standard "compels summary judgment if the non-moving party 'rests merely on

11

conclusory allegations, improbable inferences, and unsupported speculation'"). <u>Feliciano de la Cruz v. El Conquistador Resort and Country Club</u>, 218 F.3d 1, 5 (1st Cir.2000)(citation omitted).

While, initially, the burden is on the moving party to aver "an absence of evidence to support the nonmoving party's case." <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir.1990) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)), the burden then shifts to the nonmoving party, who must oppose the motion by presenting facts that show that a genuine "trialworthy issue remains." <u>Cadle Co. v. Haynes</u>, 116 F.3d 957, 960 (1st Cir. 1997) (citing <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F.3d 731, 735 (1st Cir.1995); <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir.1994)).

The legal standard for summary judgment is not changed when parties file cross-motions for summary judgment. <u>Adria Int'l Group, Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir.2001). Rather, cross-motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Barnes v. Fleet Nat'l Bank. N.A.</u>, 370 F.3d 164, 170 (1st Cir.2004) (internal quotation marks and citation omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." <u>Bienkowski v. Northeastern Univ.</u>, 285 F.3d

138, 140 (1st Cir.2002) (internal quotation marks and citation omitted).

### III. Discussion

(A) Wrongful termination on the basis of race

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his ... employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)(1982). It is a direct violation of Title VII if race is a motivating factor for an adverse employment action. See Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)(Core inquiry in a VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff because of a protected attribute). A plaintiff "is not required to adduce direct proof of discrimination." Id.; Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir.2004)(citing U.S. Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 716-17, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). Instead, he may "take advantage of a burden-shifting framework to raise an inference of disparate treatment." Ahern v. Shinseki, 629 F.3d at 54 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Pelumi asserts in his amended complaint that Gateway's intent was "to intimidate, harass, and otherwise harm [Pelumi] who was ...

13

a black African American," Amended Complaint ¶ 7, and that his "[w]rongful termination [was] a pretext of Employment Discrimination against [Pelumi] as a black African American." Id. at ¶ 34. Gateway denies the allegations and asserts that Pelumi's termination "was the result of the HRO investigation into a client's serious sexual harassment allegations against him and Gateway's good faith determination that [Pelumi] had engaged in inappropriate conduct which necessitated his termination." Gateway Mem. 10 (Docket # 69-1), SUF ¶ 50. It is undisputed that Gateway has adopted anti-discrimination and anti-harassment policies and practices designed to protect its employees from unlawful discrimination and its clients from abuse and harassment. SUF ¶ 6.

Nothing in Pelumi's allegations or additional submissions constitutes direct evidence of unlawful discrimination against him on the basis of his race. Therefore, Gateway's motion for summary judgment is considered under the McDonnell-Douglas burden-shifting analysis. In order to establish a *prima facie* case for a claim of termination of employment based on race, Pelumi must first show that (1) he is a member of a protected class; (2) he was adequately performing his job; (3) he suffered an adverse employment action; and (4) his position remained open or his employer replaced him with a person whose qualifications were similar to his. Rodriquez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54

14

(1st Cir. 2000)(noting that the task of establishing a *prima facie* case of disparate treatment is not onerous); Ahern v. Shinseki, 629 F.3d at 54 ("Making this modest showing raises an inference of intentional discrimination.")(citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Only if Pelumi establishes a *prima facie* case does the inference of unlawful discrimination shift the burden of production to Gateway to articulate a legitimate, nondiscriminatory reason for the termination of Pelumi's employment. Ahern v. Shinseki, 629 F.3d at 54. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir.1990). If Gateway meets that burden, Pelumi is then required to show that Gateway's reason is merely pretextual and that Gateway intentionally discriminated against Pelumi. Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996). As noted by the First Circuit, "the burden that shifts to the defendant-employer is only a burden of production, not a burden of persuasion." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d at 19 n. 1 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")(quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

In this case, Pelumi is unable to make out a *prima facie* case

of wrongful termination based on race. Although he is a member of a protected class and the termination of his employment constitutes an adverse employment action, he fails to establish that he was adequately performing his job, and he has offered no evidence that his position remained open or that Gateway replaced him with an employee of comparable qualification who is not a member of a protected class.

Specifically, Pelumi's employment record is replete with written warnings documenting Pelumi's difficulties with adhering to Gateway's employment policies and/or his job requirements. At least three of those warnings related to Pelumi's inability to maintain appropriate boundaries with Gateway's clients, to treat the clients professionally and with respect, and/or to preserve client confidentiality. See, e.g. SUF ¶¶ 21, 24, 26, 27, 28. Eventually, Pelumi's conduct resulted in a complaint of sexual harassment by a client. The incident was investigated by Gateway's HROs and, when the client's accusations were corroborated by another client and, in part, by Pelumi's own admissions that he had given out his cell phone number and made unprofessional comments regarding Gateway's clients, HRO Braet concluded that further employment of Pelumi would pose a serious risk to Gateway's clients.

Pelumi suggests that he already has established a *prima facie* case on the ground that the defendants' motions to dismiss his complaint and amended complaint were denied. However, the ability

16

to withstand a 12(b)(6) motion to dismiss only requires a plaintiff to "state a claim to relief that is plausible on its face;" it does not require the plaintiff to provide support for a *prima facie* case. Rodriguez-Reyes v. Molina-Rodriguez, —F.3d —, 2013 WL 1173679 (1st Cir. Mar. 22, 2013). While Pelumi's unsupported, but properly pled, allegations were sufficient to overcome the defendants' 12(b)(6) motions, they fall short at summary judgment, where Pelumi is required to meet his burden under McDonnell-Douglas.

Pelumi offers no information about whether his position was left open or whether it was filled by another individual of comparable qualification; he does suggest, however, that another, white, employee ("R.B") was treated more favorably by Gateway. In particular, Pelumi alleges that Gateway did not discipline R.B. for a 2005 medication error but, instead, disciplined Pelumi. In response, Gateway states that (1) R.B. was not disciplined for the medication error because the error was discovered during Pelumi's shift (and Pelumi acknowledged the seriousness of the error without contesting it at that time), SUF ¶¶ 22, 23; and (2) R.B. was never accused of sexual harassment during his employment by Gateway. SUF ¶¶ 74-76. Both of Gateway's assertions regarding R.B. are uncontested by Pelumi and do not serve to support Pelumi's *prima facie* case of race-based discrimination.

Even if all inferences were drawn in Pelumi's favor, as is

appropriate when deciding a motion for summary judgment, Pelumi has not satisfied the requirements for establishing a *prima facie* case. The undisputed facts reveal that Pelumi repeatedly engaged in inappropriate conduct with respect to Gateway's clients and that, even after repeated warnings, he failed to adhere to Gateway's policies. That, in itself, is sufficient to establish that Pelumi's job performance was less than adequate.

Moreover, even if the Court were to assume that Pelumi's submissions sufficiently establishes a *prima facie* case, Gateway has articulated a facially nondiscriminatory reason for the termination of Pelumi's employment, and Pelumi has not demonstrated that Gateway's proffered reason was a pretext and that he was terminated because of his race. See <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d at 95 (If the defendant can meet its burden, "the plaintiff must then show that the defendant's reason is merely pretextual and that defendant intentionally discriminated against him or her"). "The burden that shifts to the defendant-employer is only a burden of production, not a burden of persuasion." <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d at 19 n. 1 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")

Gateway terminated Pelumi's employment after receiving, from one of its clients, a complaint containing allegations of a serious

nature, which were subsequently investigated and corroborated by another client. In the course of the investigation, Pelumi acknowledged some of the conduct alleged against him, and he expressed his negative personal views regarding the clients with whom he had to interact on a daily basis and for whom he was responsible. Pelumi's claim that he was discriminated against on the basis of his race is limited to (1) his assertion that this was, in fact, the case, and (2) a suggestion that a white employee was not disciplined for an entirely different infraction. In light of the undisputed facts of this case, where the record is "devoid of adequate direct or circumstantial evidence of intentional racial ... discrimination," on the part of Gateway, <u>Rodriquez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d at 19-20, this Court concludes that Pelumi cannot avert summary judgment.

(B) State Claims

Pelumi's additional claims require no lengthy discussion. Under Rhode Island law, to prevail on a claim of libel, Pelumi must prove the following elements: "(1) * * * a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages." <u>Trainor v. The Standard Times</u>, 924 A.2d 766, 769-770 (R.I. 2007)(citing <u>Mills v. C.H.I.L.D., Inc.</u>, 837 A.2d 714, 720 (R.I.2003); <u>see also</u> <u>Kevorkian v. Glass</u>, 913 A.2d 1043, 1047 (R.I.2007); <u>Alves v. Hometown Newspapers, Inc.</u>, 857 A.2d 743, 751

19

(R.I.2004); <u>Healey v. New England Newspapers, Inc.</u>, 555 A.2d 321, 324 (R.I.1989)).

"[F]or statements to qualify as libel per se, the "'publication [must] impute[ ] insolvency, financial embarrassment, unworthiness of credit, or failure in business to a plaintiff, * * * [b]ut to make them so * * * it is essential that such imputation relate to or affect the plaintiff in his business.'" <u>Swerdlick v. Koch</u>, 721 A.2d 849, 861 (R.I. 1998)(quoting <u>Andoscia v. Coady</u>, 99 R.I. 731, 736, 210 A.2d 581, 584 (1965)).

To recover for a claim of "false light," Pelumi must establish that "'[t]here has been some publication of a false or fictitious fact which implies an association which does not exist; [and] [t]he association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances.'" <u>Cullen v. Auclair</u>, 809 A.2d 1107, 1112 (R.I. 2002)(quoting <u>Swerdlick v. Koch</u>, 721 A.2d at 861; R.I. Gen. Laws § 9-1-28.1(a)(4)(i)(A)(B)).

Finally, regarding disclosure of private facts, Pelumi must establish that (1) there has been some publication of a private fact; and (2) the fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities. R.I. Gen. Laws 1956, § 9-1-28.1(a)(3)(i)(A)(B). The term "publication" only requires that the information be repeated to a third party. <u>Pontbriant v. Sundlun</u>, 699 A.2d 856 (R.I. 1997).

With respect to these claims, Pelumi only asserts (without offering any evidentiary support for his assertions) that Gateway "distributed the alleged termination letter at Tri-Hab" and that such distribution "resulted in rumors about Plaintiffs [sic] false accusations and ultimate termination for sexual harassment around the community." Pelumi Mem. at 22 (Docket # 71). Although Pelumi states that he is "attaching other people's declarations that have overheard" such rumors, and he lists these declarations as Exhibit 18 (Docket # 72, Page 1 of 1), Pelumi has submitted only his own affidavit. Further, as Gateway correctly points out, Pelumi concedes that he "wasn't in any position to know whom the defendant shared the termination and corrective action form with, but the rumors spread all over Tri-Hab." Pelumi Mem. at 5. In other words, Pelumi's claims are based entirely on his own unsupported accusations. Moreover, as Pelumi candidly explained in his deposition, he showed the corrective action form to several people, Exhibit E, 117:1-24, and he told his friends, his girlfriend, his mother, his family and "everybody, all of my people" that his employment was terminated for sexual harassment. Id. at 142:21-143:2. In the absence of any evidentiary support for Pelumi's contention that Gateway disclosed defamatory or confidential information to any third parties, Pelumi's submissions are insufficient to withstand Gateway's motion for summary judgment.

(C) Punitive Damages

In light of this Court's determination that all of Pelumi's claims must be dismissed, Pelumi's request for punitive damages is moot. However, even if any of Pelumi's claims had survived, his allegations against Gateway are insufficient to establish that Gateway acted "maliciously or in bad faith." <u>Peckham v. Hirschfeld</u>, 570 A.2d 663, 669 (R.I. 1990). After Gateway received a complaint from one of its clients regarding Pelumi's conduct, it investigated the matter, afforded Pelumi an opportunity to address the Grievance, and eventually decided to terminate Pelumi's employment. Nothing in the record suggests that Gateway acted improperly; in fact, it is well-documented that, during Pelumi's six years of employment, Gateway gave Pelumi numerous opportunities to correct other errors in his performance.

## Conclusion

For the reasons stated herein, Gateway's motion for summary judgment on all counts of the Complaint is GRANTED and Pelumi's cross-motion is DENIED. The clerk is directed to enter judgment in favor of Gateway.


SO ORDERED.


<u>/s/ Mary M. Lisi</u>

Mary M. Lisi
Chief United States District Judge

April 3, 2013